The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 23, 2022

**2022COA66**

**No. 20CA1881, *In re Marriage of Olsen* — Family Law — Parents and Children — Assisted Reproduction — Embryos**

As a matter of first impression, a division of the court of appeals applies the test set forth in *In re Marriage of Rooks*, 2018 CO 85, to the following situation: one party wishes to donate pre-embryos based on her sincerely held religious beliefs, and the other party wishes to destroy the pre-embryos to avoid procreation. Applying the principle that "*ordinarily* a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of his or her own," the division concludes that the party seeking to donate here does not prevail. *In re Marriage of Fabos*, 2019 COA 80, ¶ 45 (emphasis in original).

COLORADO COURT OF APPEALS                                      **2022COA66**

Court of Appeals No. 20CA1881
El Paso County District Court No. 12DR5458
Honorable Timothy Schutz, Judge

In re the Marriage of

Jamie R. Fabos, f/k/a Jamie R. Olsen,

Appellee,

and

Justin R. Olsen,

Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE BERGER
Brown and Johnson, JJ., concur

Announced June 23, 2022

Telios Law PLLC, Theresa Lynn Sidebotham, Joseph B. Brown, Monument, Colorado, for Appellee

Paige Mackey Murray LLC, Paige Mackey Murray, Boulder, Colorado, for Appellant

¶ 1     Jamie R. Fabos (wife), formerly known as Jamie R. Olsen, and Justin R. Olsen (husband) continue to dispute the disposition of their cryogenically frozen pre-embryos after their divorce.  This case is before us again on husband's appeal from the district court's judgment on remand after his first appeal, *In re Marriage of Fabos*, 2019 COA 80.

¶ 2     In this second appeal, we review the district court's award of the parties' pre-embryos to wife based on its application of the multi-factor balancing test from *In re Marriage of Rooks*, 2018 CO 85, as well as the remand instructions from *Fabos*.  *Rooks* resolved a dispute between one spouse who wanted to implant pre-embryos to have children and the other spouse who wanted to destroy the pre-embryos to avoid becoming a genetic parent.  *Id.* at ¶¶ 3, 14.  The supreme court recognized that the parties' constitutionally based interests "in either achieving or avoiding genetic parenthood" formed the underpinnings of the analysis.  *Id.* at ¶ 64.  *Rooks*, however, did not address, as part of its balancing test, the issue of one party's desire to donate the pre-embryos versus the other party's desire to destroy them.

¶ 3     This case centers on a dispute between one spouse who wants to donate the pre-embryos to another couple because of her religious belief that they are human lives and must be preserved and the other spouse who wants to destroy the pre-embryos to avoid procreation.  Therefore, this case presents an issue not addressed by *Rooks*: how to account for one party's religious beliefs as part of the balancing test.

¶ 4     We greatly respect the district court's careful consideration of these extraordinarily difficult legal questions and its extensive order after remand.  But, for the reasons explained below, we conclude that the district court erred by misapplying the *Rook*s factors and by failing to comply with the mandate from *Fabos*.  We reverse the judgment, direct entry of judgment for husband, and remand the case solely for the entry of judgment and any collateral orders necessary to enforce that judgment.

## I.     Relevant Facts and Procedural History

¶ 5     During their marriage, the parties wanted to have children but were unable to conceive naturally.  They visited a fertility clinic for in vitro fertilization (IVF).  Two of the resulting pre-embryos were implanted successfully, resulting in wife giving birth to the parties'

2

twins in October 2011. Two additional pre-embryos were cryogenically frozen and placed in storage.

¶ 6     Before the parties underwent IVF, the fertility clinic presented them with a form agreement entitled "Informed Consent for Assisted Reproduction." The form agreement contained choices for the disposition of the pre-embryos in two scenarios — (1) on their mutual death or incapacity, and (2) when wife reaches age fifty-five. Those choices were:

> 1. thaw and discard the pre-embryos;
>
> 2. donate the pre-embryos for research; or
>
> 3. donate the pre-embryos to another couple.

For both scenarios, the parties each initialed the line next to the third option — to donate the pre-embryos to another couple.

¶ 7     The form agreement did not, however, contain an option regarding the disposition of the pre-embryos in the event of divorce. Instead, the form agreement provided that ownership of the pre-embryos on dissolution of marriage will be "as directed by court decree and/or settlement agreement." The parties signed the form agreement, without altering the form agreement's divorce provision

or separately specifying in a different agreement the disposition of the pre-embryos in the event of divorce.

¶ 8    In December 2012, wife petitioned to dissolve the parties' marriage. The parties disagreed on the disposition of the stored pre-embryos. Wife wanted to donate them to another infertile couple, whereas husband wanted to thaw and discard them.

¶ 9    After an evidentiary hearing, the district court awarded the pre-embryos to wife for donation to another couple. Husband appealed. A division of this court in *Fabos* reversed and remanded for the district court to reconsider the case, applying the supreme court's balancing of interests framework from *Rooks*, ¶¶ 65-72, which had been announced after the entry of the district court's first judgment. *See Fabos*, ¶¶ 9, 16, 57.

¶ 10    The division further instructed the district court not to weight "wife's subjective belief that the pre-embryos should be protected as human life more heavily than husband's interest in not procreating using the pre-embryos." *Id.* at ¶ 57. And, critical to our disposition, the *Fabos* division held that "*ordinarily* a party not wanting to procreate should prevail when the other party wants to

4

donate the pre-embryos instead of using them to have a child of his or her own." *Id.* at ¶ 45 (emphasis in original).

¶ 11 On remand, the district court held another evidentiary hearing. At the second hearing, wife claimed that her firmly held religious beliefs and corresponding constitutional right to freedom of religion under the First Amendment to the United States Constitution compelled a decision in her favor.

¶ 12 In a comprehensive order, the district court again awarded the pre-embryos to wife for donation to third parties.[1] Husband again appealed. The district court stayed the judgment pending the issuance of the mandate of this court.

---

[1] At the hearing on remand, wife presented an alternative intended use of the pre-embryos by saying that she would have them implanted if her interest in donating them was not strong enough to overcome husband's interest in avoiding procreation. However, the district court found that, given the acrimony between the parties since the dissolution of their marriage and the potential that more genetic children between the parties would result, wife's alternative use would not prevail in a balancing analysis against husband's interest. Accordingly, it ordered that wife could only donate the pre-embryos and not have them implanted. Wife did not cross-appeal this part of the district court's judgment.

## II.  Disposition of the Parties' Stored Pre-Embryos

¶ 13  Husband contends that the district court erred by awarding the pre-embryos to wife based on the subjective importance of her religious belief that the pre-embryos are human lives.  He argues that the court violated *Fabos* and *Rooks* by again weighting wife's religious beliefs more heavily than his interest in avoiding procreation.

¶ 14  We agree that the district court's judgment cannot stand.  The court misapplied the *Rooks* factors and did not follow the mandate from *Fabos* to avoid "weighting wife's subjective belief that the pre-embryos should be protected as human life more heavily than husband's interest in not procreating using the pre-embryos." *Fabos*, ¶ 57.  We conclude, as a matter of law based on a proper application of the *Rooks* factors and the *Fabos* mandate, that the present case is not one of the rare circumstances where a party wanting to donate the pre-embryos to third parties can prevail over the other party who opposes procreating with the pre-embryos.  *See Rooks*, ¶ 32; *Fabos*, ¶¶ 34, 38, 45.

## A. Standard of Review

Whether a district court applied the correct legal standard is an issue we review de novo. *See LaFond v. Sweeney*, 2015 CO 3, ¶ 12. We also review de novo whether the district court complied with this court's mandate in *Fabos*. *See Thompson v. Catlin Ins. Co. (UK)*, 2018 CO 95, ¶ 20.

Because pre-embryos are marital property (albeit of a "special character," *Rooks*, ¶ 57) we apply an abuse of discretion standard to the court's award of the pre-embryos to one of the parties, *Fabos*, ¶ 21. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law. *In re Marriage of Evans*, 2021 COA 141, ¶ 25.

## B. Legal Standards

### 1. *Rooks*

As noted, *Rooks* similarly involved a divorcing couple's dispute over the disposition of their cryogenically frozen pre-embryos when their IVF agreement did not specify the disposition of the pre-embryos on divorce but provided only that the dissolution court would decide the issue. *See Rooks*, ¶¶ 2-3, 13. Like the parties here, the couple in *Rooks* had successfully implanted some of their

pre-embryos, resulting in the births of their children, and they had frozen and stored the remaining pre-embryos. *Id.* at ¶¶ 3, 7, 12.

¶ 18 Because the parties' agreement in *Rooks* did not address the disposition of the pre-embryos on divorce, the district court in that case applied a balancing of the interests test and awarded the pre-embryos to the husband, who wanted to thaw and discard them, finding that, under the circumstances, his right "not to be forced to become a genetic parent" outweighed the wife's right to use the pre-embryos to have more children. *Id.* at ¶¶ 18-22. The wife appealed, and a division of this court affirmed the district court's ruling. *Id.* at ¶¶ 23-30.

¶ 19 The supreme court granted certiorari review. After finding no controlling Colorado authority, it examined the various approaches courts in other states have taken to resolve disputes between divorcing spouses over the disposition of stored pre-embryos. *Id.* at ¶¶ 31-32, 40-48. It held that Colorado courts must resolve such disputes by first looking to any agreement between the parties concerning the disposition of the pre-embryos on divorce. *Id.* at ¶¶ 59-63. If the parties agreed to a disposition on divorce, that agreement must be enforced. *Id.* In the absence of an agreement,

8

however, courts "should balance the parties' respective interests and award the pre-embryos accordingly." *Id.* at ¶ 64; *see also id.* at ¶¶ 33-34. The supreme court provided the following "non-exhaustive list" of factors that courts should weigh in determining whose wishes concerning marital pre-embryos should prevail:

1. A court should consider "the intended use of the party seeking to preserve the disputed pre-embryos." *Id.* at ¶ 66. Important to our disposition of this case, the supreme court held that "[a] party who seeks to become a genetic parent through implantation of the pre-embryos . . . has a weightier interest than one who seeks to donate the pre-embryos to another couple." *Id.*

2. A court should consider the demonstrated physical ability or inability of the party seeking to implant the pre-embryos to have a genetic child through other means. *Id.* at ¶ 67.

3. Relatedly, a court should consider the parties' original reasons for pursuing IVF, which may favor preservation if, for example, they used IVF to preserve a spouse's ability to have a genetic child in the face of fertility-impairing medical treatment. *Id.* at ¶ 68.

4. A court should consider the hardship to the party seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations. *Id.* at ¶ 69.

5. A court should consider either party's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings. *Id.* at ¶ 70.

6. Finally, other factors "may be relevant on a case-by-case basis." *Id.* at ¶ 71.

¶ 20     *Rooks* also identified certain factors that a court can never consider when balancing the parties' interests relative to the disposition of their pre-embryos. *See id.* at ¶¶ 65, 71, 73. Specifically, a court may not consider whether a party seeking to become a genetic parent using the pre-embryos can afford to have another child, the number of either party's existing children as the sole factor in the analysis, or that a party could adopt a child instead of having a genetic child using the pre-embryos. *Id.* at ¶ 71.

¶ 21     The *Rooks* court stated that its balancing framework "recognizes that both spouses have equally valid, constitutionally based interests in procreational autonomy." *Id.* at ¶ 72. The supreme court also characterized the parties' interests in either

achieving procreation or avoiding procreation as "equivalently important, yet competing." *Id.* at ¶ 74.

### 2.  *Fabos*

¶ 22      In reversing the district court's first award of the pre-embryos to wife, the *Fabos* division instructed the court to apply the *Rooks* balancing of interests test on remand. *Fabos*, ¶¶ 16, 57. The division concluded that the district court erred by crediting wife's belief that the pre-embryos are human lives and her desire to donate them for "a productive purpose" as "innately and unavoidably superior" to husband's desire to avoid procreation. *Id.* at ¶ 53. By doing so, the district court "tilted the scale" in favor of wife based on a factor the *Rooks* court didn't recognize — the relative strength or sincerity of the parties' respective personal or moral convictions. According to the *Fabos* division, the district court's additional factor "does not advance the [*Rooks*] court's charge of giving primacy to one of 'the equivalently important, yet competing, right to procreate and right to avoid procreation'"; is "contrary to established law" that pre-embryos are not persons under Colorado law; and is inconsistent with the fact that a party who wants to donate has a *less* weighty interest than a party who

wants to have children using the pre-embryos. *Id.* at ¶¶ 51-55

(quoting *Rooks*, ¶ 74); *see also Rooks*, ¶¶ 56, 66.

¶ 23　　Although the *Rooks* factors are not exhaustive and the record

supported the district court's finding that wife sincerely and

passionately believed that the pre-embryos are human lives, the

division concluded that the district court erred by elevating wife's

personal moral beliefs over husband's constitutional right to avoid

procreation. *Fabos*, ¶¶ 54-55. The division declined to adopt a

"bright line" rule that, because wife wants to donate the pre-

embryos rather than implant them to have children, she cannot

prevail under any circumstance over husband's interest in avoiding

procreation. *See id.* at ¶¶ 35-40. Echoing language in *Rooks*, the

division further held, however, that "*ordinarily* a party not wanting

to procreate should prevail when the other party wants to donate

the pre-embryos instead of using them to have a child of his or her

own." *Id.* at ¶ 45 (emphasis in original); *see id.* at ¶¶ 34, 38.[2]

---

[2] *In re Marriage of Rooks* referred to this language in a section of its opinion surveying how other jurisdictions have resolved these questions, not in its holding. 2018 CO 85, ¶ 32. But the supreme court relied on *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), in articulating the *Rooks* factors, specifically citing *Davis* for the

¶ 24    On remand, *Fabos* instructed the district court to

- rebalance the parties' interests in accord with *Rooks*;

- do so "without weighting wife's subjective belief that the pre-embryos should be protected as human life more heavily than husband's interest in not procreating using the pre-embryos"; and

- allow the parties an opportunity to present additional evidence and argument.

*Id.* at ¶ 57.

### C.    The Judgment on Remand

¶ 25    This brings us to the proceedings and judgment on remand, in which the district court addressed the *Rooks* factors as follows:

1. *Intended Use by the Party Wanting to Preserve the Pre-Embryos.*  The court weighted wife's interest under this

---

proposition that a "party who seeks to become a genetic parent through implantation of the pre-embryos, for example, has a weightier interest than one who seeks to donate the pre-embryos to another couple." *Rooks,* ¶¶ 66, 69.  Consistent with *Rooks, Fabos* extended Colorado's reliance on *Davis* for the proposition that "*ordinarily* a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of his or her own." *In re Marriage of Fabos*, 2019 COA 80, ¶ 45 (emphasis in original).

13

factor as "substantial." The court acknowledged that "[o]n an objective scale," a party's interest in wanting to have a child using the pre-embryos is entitled to greater weight than a party's interest in donating the pre-embryos to a third party. But it did not accord wife's interest in donation *less* weight than if she wanted to have the pre-embryos implanted. Instead, based on the "subjective importance" of wife's "bona fide, long-standing, and sincere" religious beliefs and her "deeply rooted conviction that pre-embryos are human life," it weighted her interest in donating the pre-embryos the same as if she wanted to implant them.

2. *Ability or Inability to Become a Genetic Parent Otherwise.* The court weighted this factor slightly in wife's favor, even though the parties had already had genetic children using the pre-embryos and wife's primary interest was to donate the pre-embryos, not to have more children herself.

3. *Reasons for Undertaking IVF.* The court found this factor to be neutral, noting that the parties had participated in IVF to have a genetic child, they had achieved that goal, and their

14

current interests were no longer consistent with their original reason for undergoing IVF.

4. *Emotional, Financial, or Logistical Hardship for the Party Seeking to Avoid Becoming a Genetic Parent.* The court found that the emotional burden on husband would be "significant" if wife were permitted to preserve the pre-embryos and donate them to another couple to have a child. The court said it was persuaded that husband's concern about not being a part of a child's life if that child was created with his genetic material was "an essential part of how [husband] views himself," "sincere," and "grounded in his life experiences." The court found that husband's characterization of this value was "somewhat overstated" based on the IVF agreement to donate the pre-embryos in other scenarios — on the parties' mutual death or incapacity and when wife reaches age fifty-five. It viewed the IVF agreement as the parties' "prior balancing" of their respective values in favor of wife. Still, the court concluded that "the emotional, financial, and intangible burdens on" husband if

wife were permitted to donate the pre-embryos "would be significant."

5. *Bad Faith.*  The court found that neither party acted in bad faith, and therefore this factor did not weigh in favor of either party.

6. *Other Considerations.*  The court weighted this "catch-all" factor in wife's favor.  It considered the parties' agreement to donate the pre-embryos in other scenarios and its assessments of the parties' credibility and the subjective importance of their constitutionally based beliefs to each of them.  It found that wife's belief that the pre-embryos are human lives was "bona fide, passionate, [and] antedate[s] this dispute," whereas husband failed to articulate a basis for changing his mind concerning the parties' previous decision to prioritize wife's beliefs by agreeing to donate the pre-embryos in other scenarios.

¶ 26   In conclusion, the court stated that both parties' interests — wife's interest in preserving the pre-embryos and husband's interest in discarding them — were grounded in rights guaranteed by the Constitution.  But it concluded that wife's interest in donating the

pre-embryos was weightier than husband's interest in avoiding procreation. Therefore, it awarded the pre-embryos to wife to donate to another couple.

## D. The District Court Misapplied the *Rooks* Factors and Failed to Comply with the *Fabos* Mandate

### 1. The District Court Misapplied *Rooks* by Considering Wife's Religious Beliefs as Part of the First Factor

¶ 27 The district court erred by considering wife's religious belief that the pre-embryos are human lives when weighting the first *Rooks* factor — the intended use of the party seeking to preserve the disputed pre-embryos.

¶ 28 It is undisputed that wife's primary intended use of the pre-embryos is to donate them to another infertile couple. The court first acknowledged that, "[o]n an objective scale," a party's desire to implant pre-embryos to bear children is entitled to greater weight than a party's desire to donate them. *See Rooks*, ¶ 66. But it noted that wife's desire to preserve the pre-embryos "is based upon her deeply rooted conviction that pre-embryos are human life," which is "grounded in [her] sincerely held religious beliefs." It then acknowledged that *Fabos* instructed it not to give this factor greater or dispositive weight solely because it is based upon wife's religious

17

views.  *See Fabos*, ¶ 53.  Nonetheless, the court refused to "ignore[] or discount[]" the subjective importance of this factor to wife "simply because it is bound up with her religious beliefs."  Because of the sincerity of wife's religious belief that the pre-embryos are human life, the court weighted her intent to donate the pre-embryos the same as if she desired to implant them.  And it weighted this factor substantially in wife's favor.

¶ 29     The district court's application of this first *Rooks* factor was erroneous in two ways.  First, contrary to *Rooks*, the court weighted wife's desire to donate the pre-embryos as equivalent to a desire to implant them to become a genetic parent.  *See Rooks*, ¶ 66.  The supreme court made clear that "[a] party who seeks to become a genetic parent through implantation of the pre-embryos, for example, has a weightier interest than one who seeks to donate the pre-embryos to another couple."  *Id.*

¶ 30     Second, contrary to *Fabos*, the court again considered wife's subjective beliefs regarding the morality of preserving the pre-embryos.  *See Fabos*, ¶ 52.  The first *Rooks* factor simply asks what the party seeking to preserve the pre-embryos intends to do with them.  *Rooks*, ¶ 66.  Does that party seek to implant the pre-

embryos to achieve genetic parenthood or does that party seek to donate them? The first factor is not concerned with *why* the party prefers to preserve the pre-embryos over discarding them.

¶ 31     When reviewing how the district court evaluated wife's interest in donating the pre-embryos in its original, pre-remand order, the *Fabos* division explained that

> the district court identified what appears to be a corollary factor that turned on the "the parties' personal views of the morality of discarding fertilized embryos" and weighted that factor heavily in favor of wife. Nothing in [*Rooks*] suggests that the weight to be attributed to a party's interest in donating should in any way turn on that party's personal views of the morality of donating.

*Fabos*, ¶ 52. The division criticized the court for "weighting 'heavily' wife's personal beliefs that the pre-embryos were human lives and describing her interest in donating them as a 'productive purpose' as compared with husband's intent to discard them." *Id.* at ¶ 53.

¶ 32     We recognize that, on remand, the court did not again make its own value judgment about the parties' desired disposition of the pre-embryos — that wife intends to use the pre-embryos for a "productive purpose" whereas husband intends to "simply" discard them. *See id.* Nevertheless, the court weighted the first *Rooks*

19

factor substantially in wife's favor by doing the very thing *Fabos* instructed it not to do. The court weighted this factor based on wife's deeply held personal views of the morality of discarding the pre-embryos. The only difference between how the court treated this factor before and after remand is that wife's moral views were more clearly "bound up with her religious beliefs" on remand. But regardless of whether such moral beliefs are religious or secular, they should not form part of the court's consideration of the first *Rooks* factor.

¶ 33    The result of the district court's errors in applying the first *Rooks* factor is that it weighted that factor far more significantly in wife's favor than it should have. *Rooks* instructs us that a party's right to achieve procreation and a party's right to avoid procreation are "equivalently important," constitutionally based rights. *Rooks*, ¶¶ 3, 74. It follows that a party's desire to implant pre-embryos to achieve genetic parenthood and a party's desire to avoid genetic parenthood likewise are "equivalently important." And, because a party's desire to donate pre-embryos is entitled to less weight than a party's desire to implant them, a party's desire to donate must also be entitled to less weight than a party's desire to avoid genetic

parenthood. *See Fabos*, ¶ 45 ("*[O]rdinarily* a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of his or her own.") (emphasis in original).

2. Although It Was Appropriate to Consider Wife's Religious Beliefs, the District Court Did Not Comply with the *Fabos* Mandate Not to Weight Those Beliefs More Heavily than Husband's Interest in Not Procreating

¶ 34 Our analysis relating to the first *Rooks* factor should not be read to mean that the district court erred by considering wife's religious beliefs. To the contrary, it was proper — and required — for the court to hear evidence concerning wife's religious beliefs about the disposition of pre-embryos. *See Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. ___, ___, 138 S. Ct. 1719, 1731 (2018); *United States v. Seeger*, 380 U.S. 163, 185 (1965). But instead of considering wife's religious beliefs as part of the first *Rooks* factor, which erroneously caused the district court to weight that factor substantially in wife's favor, the court should have considered wife's beliefs as an additional factor beyond those articulated in *Rooks*.

21

¶ 35    True, *Rooks* identified the "hardship for the person seeking to avoid becoming a genetic parent" as a factor a court should consider without identifying as a corresponding factor the hardship to the person seeking to preserve the pre-embryos if a court authorized the pre-embryos to be discarded. *Rooks*, ¶ 69; *Fabos*, ¶ 56 ("[T]o the extent the supreme court in [*Rooks*] identified hardship or emotional toll as a consideration, it was only with respect to 'the spouse seeking to avoid becoming a genetic parent.'" (quoting *Rooks*, ¶ 4)). But *Rooks* also authorized courts to consider other relevant factors on a case-by-case basis. *Rooks*, ¶ 71. And no one's sincerely held religious beliefs were at issue in *Rooks*.

¶ 36    Thus, we agree with the district court that it was proper to consider wife's religiously grounded beliefs and husband's secularly grounded beliefs as part of the *Rooks* balancing framework. Husband's beliefs were properly considered as part of the fourth *Rooks* factor — the hardship to the person seeking to avoid becoming a genetic parent — and wife's beliefs were properly considered as an additional factor beyond those articulated in *Rooks*.

¶ 37    We also acknowledge that it is the district court's prerogative to make credibility determinations. *Fabos*, ¶ 46; *In re Marriage of Farr*, 228 P.3d 267, 270 (Colo. App. 2010). And we acknowledge that, based on the parties' IVF agreement, the court found husband's "characterization" of his stated values "somewhat overstated." But the court concluded that husband's beliefs were "an essential part of how [he] views himself" and that the emotional burden on him would be significant.[3] It did not find that husband's beliefs were not credible.

¶ 38    Under these circumstances, it was not proper for the court to take the further step of attempting to evaluate the "subjective importance" of the parties' constitutionally based beliefs to them — either wife's religious beliefs to her or husband's secular beliefs to him. *See Masterpiece Cakeshop*, 584 U.S. at ___, 138 S. Ct. at 1731

---

[3] As *Rooks* directed, the district court on remand considered the "emotional, financial, or logistical considerations" as part of its consideration of the hardship to husband. *Rooks*, ¶ 69. But the court found the financial aspect of this factor to be neutral and the logistical aspect of this factor capable of mitigation through appropriate orders placing limitations on the manner in which the pre-embryos could be donated. Accordingly, the only consideration given any weight as part of this factor was the emotional burden on husband, which the court found would be significant.

(a court cannot "pass[] judgment upon" a party's religious beliefs); *see also Van Osdol v. Vogt,* 908 P.2d 1122, 1130 (Colo. 1996) ("[I]t is not the position of a judge to decide what a person's belief system is or should be, or *how important those beliefs are to that person.*") (emphasis added).  By doing so, the court ran afoul of *Fabos'* mandate that it rebalance the parties' interests in accord with *Rooks* "without weighting wife's subjective belief that the pre-embryos should be protected as human life more heavily than husband's interest in not procreating using the pre-embryos." *Fabos,* ¶ 57.

3. The District Court Misapplied the Second *Rooks* Factor by Weighting it Slightly in Favor of Wife when Wife Wanted to Donate Rather Than Implant

¶ 39     The second *Rooks* factor requires the district court to consider "the demonstrated physical ability (or conversely, inability) of the party *seeking to implant* the disputed pre-embryos to have biological children through other means."  *Rooks,* ¶ 67 (emphasis added).

¶ 40     In its original, pre-remand order allocating the pre-embryos to wife, the district court considered a similarly phrased factor: "The Parties' Respective Ability to Bear Children in the Future."  Because neither party desired to use the pre-embryos "to conceive and

24

parent another child," the court concluded that this factor was "largely irrelevant to the present dispute."

¶ 41    On remand, however, it appears that the court reweighed this factor "slightly" in wife's favor because she was incapable of otherwise having more biological children and was willing to implant the pre-embryos rather than donate them as "an alternative means of achieving her ultimate objective of preserving the pre-embryos." But the district court determined that wife's alternative request to implant the pre-embryos would not prevail under the *Rooks* balancing test and wife did not cross-appeal that portion of the court's judgment. The scenario on review is one in which wife seeks to donate the pre-embryos rather than implant them. Under that scenario, wife is not a party "seeking to implant the disputed pre-embryos," so wife's ability or inability to have biological children through other means is irrelevant for purposes of the second *Rooks* factor.

¶ 42    By weighting this factor in favor of wife — even "slightly" — the district court again improperly elevated mother's "ultimate objective of preserving the pre-embryos" over husband's interest in avoiding

25

genetic parenthood, contrary to the *Fabos* mandate. Given the facts of this case, this *Rooks* factor should have been weighted neutrally.

### 4. This Case Is Not One of Those Rare Circumstances Where the Party Wanting to Donate Prevails Against the Party Wanting to Avoid Procreation

¶ 43 Ordinarily, when a district court misapplies the law, remand is required to allow the court to reweigh the evidence and rebalance the factors. *See Fabos*, ¶ 57; *see also Buckmiller v. Safeway Stores, Inc.*, 727 P.2d 1112, 1117-18 (Colo. 1986). But here, properly applying the *Rooks* factors and faithfully following the *Fabos* mandate leads us to conclude, as a matter of law, that this is not one of the rare circumstances in which a court may compel a party to procreate against their will. *See Fabos*, ¶¶ 34, 45.

¶ 44 The district court weighted the third and fifth *Rooks* factors neutrally. And it considered another factor not addressed by *Rooks* — that the parties previously prioritized wife's beliefs over husband's by agreeing to donate the pre-embryos in other scenarios — and weighted that factor in wife's favor. We see no errors in the court's consideration of these factors.

¶ 45 But, as we have explained, correctly applying the *Rooks* factors to the facts as the district court found them to be would

26

require the court to weight the first *Rooks* factor in favor of husband rather than significantly in favor of wife and to weight the second *Rooks* factor neutrally. Although the court was permitted to consider a factor not addressed by *Rooks* — wife's religious beliefs — applying the *Fabos* mandate would require the court not to weight that new factor more heavily than husband's interest in not procreating, which the court considered under the fourth *Rooks* factor. Essentially, correctly applying *Rooks* and *Fabos* would cause these two factors to offset each other.

¶ 46 When these adjustments are made, determining which party would prevail in the balancing of interests becomes a close call. And if it is a close call, husband should prevail because "*[o]rdinarily* a party not wanting to procreate should prevail when the other party wants to donate the pre-embryos instead of using them to have a child of his or her own." *Id.* at ¶ 45 (emphasis in original); *see also Szafranski v. Dunston*, 2013 IL App (1st) 122975, ¶ 42; *J.B. v. M.B.*, 783 A.2d 707, 716 (N.J. 2001); *Davis v. Davis*, 842 S.W.2d 588, 604 (Tenn. 1992).

¶ 47 Like the division in *Fabos*, however, we do not adopt a "bright line" rule that a party seeking to donate pre-embryos rather than

27

implant them can *never* prevail over the other party's interest in avoiding procreation. A party seeking to donate may prevail based on other *Rooks* factors that were not implicated by this case or based on other case-specific factors not contemplated by *Rooks*. For example, if a court found that the party wanting to avoid procreation had engaged in bad faith, that factor might tilt the analysis in favor of the party wanting to donate. *See Rooks*, ¶ 70. Or if the parties had undergone IVF solely for the altruistic purpose of donating the pre-embryos rather than to produce their own genetic children, the party seeking to donate may prevail.

¶ 48    But none of those circumstances are present here. Accordingly, we conclude that this case does not present the rare circumstance where a party wanting to donate can prevail against a party wanting to avoid procreating. *See Fabos*, ¶¶ 34, 38, 45; *see also Rooks*, ¶ 32.

     E.    Wife's Alternative Arguments for Affirming the Judgment

     1.    Free Exercise

¶ 49    Wife argues that the district court should have applied strict scrutiny to the application of *Rooks* and given dispositive weight to her Free Exercise rights because it cannot require her to participate

28

in the destruction of the pre-embryos, which she considers her children.

¶ 50     The court rejected wife's argument that strict scrutiny applied to its application of the *Rooks* test because of her religious beliefs. The court found that applying strict scrutiny would improperly tilt the *Rooks* test in wife's favor because her position is based on religion, and that neither *Rooks* nor *Fabos* sanctions elevating wife's religious view over husband's secular view.  *See Fabos*, ¶¶ 52-57; *see also Rooks*, ¶¶ 72, 74.

¶ 51     Although we are sensitive to wife's concern that awarding the pre-embryos to husband will force her to participate in their destruction against her religious beliefs, the district court can enter orders to mitigate this concern.  The district court can award husband the pre-embryos and authorize him to direct their disposal.  Wife need not be involved in the process.  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014).  Because the decision will belong to husband, wife will not be compelled to do anything in violation of her religious beliefs, and therefore there is no Free Exercise violation.

## 2. Promissory Estoppel

¶ 52     Wife argues that the district court should have applied promissory estoppel principles to enforce the parties' alleged oral agreement that the pre-embryos would not be destroyed. But wife admitted at the hearing in 2017 that the parties had no discussion about what would happen to the pre-embryos if they divorced and that, in retrospect, she wished that they had addressed that issue in the IVF agreement. *See Fabos*, ¶ 29 (concluding consistent with wife's testimony that the parties had no agreement for disposition of the pre-embryos in the event they divorced).

¶ 53     Therefore, neither the evidence nor *Fabos* supports that husband made a promise that the pre-embryos would not be destroyed on divorce. As the *Rooks* court noted, divorce is an event likely to change the parties' intent concerning the disposition of any pre-embryos they created during their marriage. *Rooks*, ¶ 62. Accordingly, without evidence of a promise concerning the disposition of the pre-embryos specifically on divorce, wife's promissory estoppel claim fails. *See Pinnacol Assurance v. Hoff*, 2016 CO 53, ¶ 66; *see also Kiely v. St. Germain*, 670 P.2d 764, 767

(Colo. 1983) (describing the doctrine of promissory estoppel as applying when a party's action is "induced by a specific promise").

### 3. Property Distribution Principles

¶ 54  Wife also argues that the court could have awarded (and that we should award) the pre-embryos to her under section 14-10-113(1)(a), C.R.S. 2021, because her contributions to creating and preserving them were greater than husband's contribution.

¶ 55  We reject this argument because that statute is not the legal standard for allocating a divorcing couple's pre-embryos. Rather, as the district court correctly concluded in rejecting wife's section 14-10-113(1) argument, pre-embryos are a special kind of marital property that are instead allocated under *Rooks'* balancing test. *See Rooks*, ¶¶ 61-72; *see also Fabos*, ¶¶ 12-13.

### 4. Bad Faith

¶ 56  Wife argues that the court should have considered husband's failure to pay one-half of the storage fees for the pre-embryos as demonstrating his bad faith and use of the pre-embryos as leverage in the dissolution proceedings. *See Rooks*, ¶ 70. The court found that husband's failure to timely and consistently pay his half of the storage fee "is not the type of bad faith conduct that is potentially

31

relevant in a dispute over the disposition of pre-embryos," and that neither party had acted in bad faith. The court further ordered wife to pay all storage costs for the pre-embryos going forward.

¶ 57 The court's findings are supported by the record. Husband testified that he did not intentionally fail to pay his half of the storage fees but rather he had not received "conclusive evidence" that wife had made the storage payments and he thought he was entitled to offset the obligation with amounts wife had agreed to pay him for their children's extracurricular activities. The court noted that the parties had "a myriad of financial disputes since their divorce." Thus, husband's failure to consistently pay the storage fees is properly viewed as an example of the parties' continuing inability to resolve their financial obligations amicably and is not indicative of bad faith in relation to the pre-embryos specifically.

### III. Disposition

¶ 58 The judgment is reversed, and we direct entry of judgment for husband on remand, awarding the pre-embryos to him to discard. We remand the case to the district court for the sole purposes of entry of this judgment and the entry of such collateral orders as may be necessary to effectuate that judgment.

JUDGE BROWN and JUDGE JOHNSON concur.